called the next case, please. Mr. Good morning. May it please the court, counsel, I am Jay Wigman, an assistant appellate defender with the Office of the State Appellate Defender, counsel for defendant Astrea Pollard, who asserts that she was not proved guilty beyond a reasonable doubt of the offense of first degree murder. This court obviously has much exposure to the law, to the criminal world, more than I do. But in 23 years of experience, I'm not certain that I have seen a case as tragic as this one. It was an utter tragedy. This infant was born prematurely, lived for 78 days, and in some senses it's amazing that the child lived as long as he did. He spent the first 30 days getting his weight up to nearly 4 pounds while staying in a hospital and receiving around-the-clock care. And then as Judge Curry described it, he went home to his mother, which he described as a chaotic, dysfunctional, and poverty-stricken world. He described the mother as being a teenager unprepared for and oblivious to the moral and legal duty of caring and providing for children. Astrea Pollard at the time was 18 years old. She already had two other children, neither of which she provided care for. She had three different fathers of the children. She had no income, no education, unstable shelter, and she's borderline mentally retarded. She was simply not capable of caring for a child under ordinary terms, and certainly not in this situation with a premature child who was sent home with a heart rate and apnea monitor, kind of intimidating equipment, and an instruction manual to help her through this. The court ultimately concluded when it entered sentence that the reality is that Ms. Pollard couldn't care for a child, much less a child in the condition of Javier, a baby. The reality is, I don't think she could care for herself. So when I say that the court failed to prove beyond a reasonable doubt that she was capable of murder, that she knew what she was doing, it's not simply advocacy, but it goes in line with what the court said. And the first part to keep in mind with that is that as to count one, which charged her with first degree murder for starving her child or failing to properly hydrate the child, the court found that that court could not find that it was done knowingly and that she had abandoned her duty to the child. And the inconsistency here is difficult to rationalize and to deal with, particularly given that the second count on which the court found the defendant guilty of first degree murder contains the first set of charges as well, in that he found that she was guilty of failing to properly feed and hydrate the child and ignored the monitor. Now the first part of that in count one, the court found could not be proven beyond a reasonable doubt, but instead was guilty of involuntary manslaughter, that she was reckless at best. To then add the second part is the difficulty that I have with this case and the difficulty in the inconsistency provided by the court. Beyond that, however, the court clearly found that she was not culpable for the first step, and I'm not certain how it can then be decided that she was culpable for the second step, which wasn't the cause of the death. Clearly the coroner found the death certificate states it was death by starvation. The second, let me ask you this, is that the court, regardless of what the court says, because often I sit there and look at these things, I may know slam to this trial judge or any other trial judge, but I always wonder why these defense lawyers bench these cases. I don't get it. Because we know what happened. But if this had been a jury case, the jury would have just found guilty or not guilty on whatever count, they wouldn't have said a word. I mean, isn't the question, regardless of what the trial judge said, whether the evidence supports the verdict? Ordinarily, yes. There is obviously a presumption that the judge has followed the law and made his decision within proper parameters. But in this instance, we have a 15-page order from the court outlining its rationale for reaching the decision it did. And there are portions of that that are plainly wrong. And the first would be the various references to Scott and Lefebvre and discussions of reckless behavior and the most prominent example being playing Russian roulette. And in Russian roulette, there is a clear danger and a very obvious threat. It is an inherently dangerous activity, as were some of the other examples given by the court. Firing a gun into a building where there are known to be occupants or firing a gun from a moving car. In each of those instances, the danger was obvious and very real. And we respectfully submit that that danger was not obvious or that, well, particularly for this defendant, it wasn't something that she could simply comprehend at all. If she couldn't understand the danger that was being created for failing to feed the child and provide proper nourishment, particularly a child underweight who needed to gain at least a pound a month, then she was incapable of understanding the effects of ignoring the sleep monitor, particularly given that the apnea monitor, the heart monitor, had been alarming two days before, had sounded, I believe, 10 to 13 times over a nine-minute period, and eventually was turned off. And there were no, at least to the defendant, obvious ill consequences of that behavior. To now find that that behavior is what caused the death and that she's culpable for having ignored that simply doesn't comport with the law. Well, if, say, a mother doesn't feed the child on Tuesday and they say, well, the child's still breathing Tuesday night, well, I didn't feed him on Wednesday and he was still breathing Wednesday night, and then third, eventually to say that because there were no ill effects from not feeding the child on Tuesday and Wednesday and ultimately leading to a starvation situation, does that work? Well, and in some of the cases where homicide is found, it has involved starving over a significant period of time. And it's also usually coupled with abusive behavior. There have been some where there are multiple beatings where children are left in the elements without proper clothing. It goes beyond just the failing to feed. And it goes beyond the failing to feed for a period here of between 12 and 24 hours at most. And part of the reason that I say that is because the mother who was in the home, the boyfriend's mother, fed the child the day before. And so it wasn't a matter of the child being starved, the monitor going off, and then not being fed and the monitor going off. The child was fed in the interim. So there was care that was being provided and there was care that she knew about. And another example is that she didn't understand that the reason that she was having trouble feeding the child was because the child hadn't been provided the proper caffeine and because the child was weakening from the hunger. And then when the other lady was able to feed the child, that somewhat assuaged things, but the mom didn't comprehend at the time that that was part and parcel of what was happening, that the child was getting weaker. She saw it as a separate event, just as I'm sure she saw the alarm as a separate event. It went off two nights before, nothing happened when it's going off now. And the alarm will turn itself off and on as it goes. It will function. Sometimes it doesn't even hit a tachycardic moment for long enough for the alarm to go off, and that's why the expert was not always able to say that it had gone off a specific number of times. And sometimes it would go off for five seconds, which meant that there probably had been more like ten seconds of an episode, and then the alarm shuts off. So it wasn't necessarily that she was disregarding the alarm. The alarm goes and it comes off and it goes and it comes off. And again, based on her experience, she had seen where that had not, to her way of thinking, presented a threat of imminent death or great bodily harm. And that leads to another example of the court's inappropriate standards here. When the trial court said, well, that's fine if you want to argue that it's okay for her to ignore it, but we wouldn't allow that from a kindergarten teacher. If a fire alarm went off in a school and then five days later, two days later, it went off again, we would not excuse a teacher from that sort of ignoring of the alarm. But the first thing I would say is that I'm unaware of any instance where a teacher has been held accountable for murder in that type of situation. More importantly, with a teacher, we are dealing with a professional who has training in these sorts of risks, who's attuned to these sorts of risks, somebody who is presumably older than the teenage defendant in this case, who is not operating under the sleep deprivation of a new mother to a child with severe heart problems brought about by the premature birth of the child. In this situation, the circumstances were such that it simply can't be imputed to her that she had the knowledge that her acts, particularly acts that aren't especially conscious at 5 in the morning, whereas presumably the teacher, we're dealing with somebody who has been up, it's 9 o'clock in the morning at a minimum, and is able to address these situations. To say that a teenager turning off an alarm that has not necessarily caused any damage before is acting so recklessly and ignoring a blatant and obvious danger, I think stretches things here. The defendant didn't even know she was pregnant, right? She did not until the 29th week, that's when the child was born. At the end of the day, is our review basically a common standard review or no? It is. It is, but I'm saying that there is no rational prior fact that could have found in these circumstances that the mother knew that the act of turning off the alarm was going to result in the death of the child. And that's partly true both because you can't impute knowledge to somebody in these circumstances the way the court did to a teacher in other circumstances, but also because the court found that she did not act knowingly as to the first half of this charge. It's an odd charge, and it's not finding. To say, well, as to half of your activity, the activity that would have a higher expectation of being met by this mother. Basic feeding of the child. The court found she wasn't culpable for murder in that instance. But then you add, well, she ignored equipment that's especially made for a child in a much more serious situation, much more complicated. Basically ignoring a symptom that she truly did not comprehend. She just thought the child wasn't eating because the child was sleepy, and that it was better for the child to sleep. And in that instance, the inconsistency here is not something that can be bridged by rational prior effect. Interestingly here, another cause presumably could be the fact that the caffeine had run out about a week before. And that's never mentioned in the charges. You would almost expect that if it were believed that it was her failure to properly care for the child, that providing prescribed medicine would be part and parcel of that. But it wasn't that. It was this alarm, which the court took to be the equivalent of life-saving equipment. But it wasn't. It's an alarm. It's something that's to get the parent aware. But again, having not presented life-threatening consequences two days earlier, it didn't reach the mom's consciousness. But to find, again, that she... How do we know what reached the mom's consciousness? You keep saying that like it's a fact. I mean, how do we know what reached the mom's consciousness? Well, partly based on the court's findings as to her limited capability. She had an IQ of 73. She wasn't capable of raising her prior two children, who were not special needs children. She had a child here that obviously had special needs. She had unstable housing. She was not capable, I believe the court termed her, as having meandered through life and meandering through parenting. And she simply wasn't capable of caring for the child, particularly this child, in the way that she needed to. And very often we talk about being able to infer intent from somebody. And I note that the state here did not charge intent. They charged knowingly. And again, this parent's particular situations, her reactions to things, indicate that she did not know and understand the consequences of her actions. Particularly when you're dealing with actions that aren't as conscious as an ordinary action would be. An action of somebody who has to be up every three hours at five in the morning responding to alarm is not going to meet the same standard of care or any sort of professional response as would a reaction in the middle of the day with a child who does not have special needs in these types of circumstances. Thank you. Ms. Kelly, good morning. May it please the court, counsel. The trial judge properly found knowledge as to count two of these events. The nurses and the respiratory therapist who dealt with the defendant at the time that Javier was being discharged from the NICU went over these procedures and what she had to do with her in great detail. Javier would not be released until she showed that she could not only feed Javier from a bottle, but that she knew how to draw the caffeine into the bottle, that she could perform all of these activities. With regard to the apnea and heart monitor, it was stressed to her how important that was, how it needed to be hooked up at all times, and what to do when the alarms went off. And she was told, and she was even handed a refrigerator magnet with the same thing, that if she could not resolve the alarm, call 911. That was the step she did not take, that she could have taken at 5.52 a.m. that both the pathologist and the emergency room pediatrician said would have saved Javier's life, that the dehydration and malnutrition could have been reversed if she had called 911, and when 911 was called later in the day and Javier was in the hospital, at the hospital, within 10 minutes of that call, that would have saved this baby's life. She was made aware of what she had to do. She knew what she had to do. She dissembled when she was spoken to by the doctors and the police at the time. She lied. She told them he had fed fine the night before, that she had fed him a bottle at 3 in the morning, that she had fed him a bottle at 9.30. She said she had even fed him a bottle a half an hour before they So the trial judge had a difficult decision in front of him, and he did parse it and possibly because malnutrition, dehydration is a process, found that the proof was not there that she had the knowledge that this would cause great bodily harm or death to Javier, but that when that was combined with what he considered the red alert, the monitoring system that was the last line of defense for the poor defenseless baby, that something was terribly wrong, and that it was going on for 14 minutes, and that she ignored it, did not call 911, yet executed a somewhat complicated procedure of turning the monitor off, not just hitting the reset button, but what was explained is you had to hit two buttons simultaneously to turn it off, went back to sleep, and did not check on him for several hours. At that time, the judge found that evidence was there to show that she had knowledge that those actions, her failure to get medical help for Javier at that time, led to the knowledge that that would cause great bodily harm or death to him, and that's why the conviction in count two should be affirmed. Thank you, Ms. Kelly. Mr. Wegman, any rebuttal? Very briefly, I would note that while she was trained by the nurses, there had been some question about the attention that she paid. She skipped the first training session and was late to the second. To the extent, though, that the training that she received can be credited at all with the child's well-being for the next month, it also has to be kept in mind that during that entire period of time, much of the care was undertaken by her boyfriend's mother, who herself had raised a premature child and said that she recognized the difficulty and that there were more steps and measures that needed to be taken than would be taken with an average child. And it was at about the time that she stepped away and relinquished much of her involvement for the purposes of allowing the mother to take care of her child that the child truly began to deteriorate. And to the extent that it was a complicated procedure in turning the equipment off, I would note that it merely required the pressing of two buttons at one time. It was a child safety device to make sure that a child didn't accidentally turn it off. But it wasn't typically all that complicated or difficult, and certainly it was something that could be accomplished by somebody half-conscious during sleep. Well, certainly somebody that was instructed how to do it and listened to that instruction and then did it. I mean, I'll grant you this is a tragic case, and you look at this and wonder, when she refused home health care, that wasn't a red flag to somebody to get DCFS involved. If there are no further questions, then I would briefly conclude by asking that this cause be reversed as you count two, remanded for imposition of a conviction for involuntary manslaughter and for resentencing. Thank you. Thank you. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand on brief recess for a panel change.